NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0200n.06

No. 23-5479

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 03, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| DOUGLAS HAWKINS, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: MOORE, KETHLEDGE, and BLOOMEKATZ, Circuit Judges.

BLOOMEKATZ, Circuit Judge. Douglas Hawkins—an attorney, investor advisor representative, certified financial planner, and traveling preacher—was convicted by a jury of various financial crimes and sentenced to ten years in prison. In this appeal, he challenges the district court's decision to apply two enhancements under the Sentencing Guidelines: one for obstruction of justice, the other for committing an offense using "sophisticated means." Both challenges are unavailing, and thus we affirm.

**BACKGROUND**

We recite the conduct underlying Hawkins's offenses as described in the presentence report, as Hawkins did not object to these facts at sentencing. *United States v. Doyle*, 711 F.3d 729, 731 (6th Cir. 2013) (citing *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008)).

Hawkins sold investment opportunities to everyday people in and around Lexington, Kentucky. Aside from typical investments like stocks and bonds, Hawkins offered his clients a

product that he described as a low-risk way to insulate their money from financial ups and downs. The product was a bit like the opposite of a mortgage: Hawkins's clients could purchase, with a lump-sum (the principal), a promissory note from a company in Oregon. The company secured the note with a deed on a rental property. Think of the note as a loan from the client to the Oregon company. One of the company's subsidiaries would manage the property and collect rent, and that income would pay interest on the note to Hawkins's clients. The terms of the note set the amount and frequency of the interest payments in advance. For the issuer of the note to meet that schedule, the properties needed to generate sufficient rental income.

Hawkins played two distinct but overlapping roles in this transaction. Wearing one hat, Hawkins was a salesman for this complex financial offering, working to the benefit of the Oregon company. He earned a commission on each note he sold. Simultaneously, he sold the notes to his clients in his role as their financial advisor. In both roles, Hawkins had legal obligations to tell his clients the truth about the nature of the notes and the financial risks associated with them. But to convince his clients to buy the notes, Hawkins lied: he told his clients they were buying ownership interests in the homes; that the homes were rented, renovated, and desirable; that the property taxes were current; that the investments were federally backed; that the properties were worth far more than the amount of the principal of the loan; and, oddly, in the case of at least one house, that the U.S. Army guaranteed that the home would always be rented. None of that was true. For instance, to reassure potential clients that they would be making sound investments, Hawkins showed them photos of the properties in immaculate condition. Yet Hawkins knew many of the properties were dilapidated, vandalized, and vacant. Plus, the actual financial instruments he was selling didn't even correspond to individual pieces of property.

Before long, the company in Oregon that issued the notes started defaulting on interest payments, and eventually it went bankrupt. Hawkins formed a new company in order to keep the notes he had already sold, and he started buying new properties with that company to sell more notes. That didn't work, so the everyday people—who in many cases had used their life savings to purchase the notes—incurred significant losses. Meanwhile, Hawkins had put some of their money into his personal bank account and his IOLTA bank account.[1] Then he used his clients' money for impermissible purposes, including to pay other investors who wanted out of the scheme and to buy one of his employees a Harley Davidson. He also used the funds from new investors to pay off interest due to old investors, in a Ponzi-like scheme.

Kentucky regulators grew suspicious of Hawkins and began to investigate. As a result, Hawkins was indicted before the United States District Court for the Eastern District of Kentucky for: one count investment advisor fraud in violation of 15 U.S.C. § 80b–6 (Count 1); one count of securities fraud in violation of 15 U.S.C. § 78j(b) (Count 2); and two counts of mail fraud in violation of 18 U.S.C. § 1341 (Counts 3 and 4).

The presentence report recommended Hawkins serve a 60-month term of imprisonment for Count 1 to run concurrently with a 135-month term of imprisonment for Counts 2, 3, and 4. The recommendation reflected two sentence enhancements that are at issue in this appeal: a two-level enhancement because Hawkins obstructed the investigation of the offense and a two-level enhancement because Hawkins's offense conduct involved sophisticated means. *See* U.S. Sent'g

---

[1] An IOLTA (Interest on Lawyers' Trust Account) is an escrow account for attorneys to store pooled client funds on a short-term basis for things like settlements or fees paid in advance. *See* American Bar Ass'n, Overview, Interest on Lawyers' Trust Accounts, https://perma.cc/Y57C-NPVE.

Comm'n, Guidelines Manual (U.S.S.G.) §§ 2B1.1(b)(10)(C), 3C1.1.  Hawkins objected to both enhancements.

At the sentencing hearing, the district court overruled Hawkins's objections.  The court determined that the obstruction-of-justice enhancement applied, accepting the presentence report's finding that Hawkins advised one of his employees to withhold certain client files from a state financial investigator.  The court also determined the sophisticated-means enhancement applied, as Hawkins had effectuated his scheme by working with, or creating, multiple corporate entities to hide his misrepresentations from his clients.  At the conclusion of the hearing, the court imposed a slightly below-Guidelines sentence of 60-months' imprisonment on Count 1 to be served concurrently with a 120-month sentence on Counts 2, 3, and 4, plus three-years' supervised release and restitution.  Hawkins timely appealed his sentence.

## DISCUSSION

We review the factual findings underlying the district court's sentencing enhancements for clear error and the court's legal conclusions de novo.  *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019); 18 U.S.C. § 3742(e)(4) ("The court of appeals . . . shall accept the findings of fact of the district court unless they are clearly erroneous.").

## I.      Obstruction-of-Justice Enhancement

Hawkins first challenges the factual determinations underlying the district court's application of a two-level Guidelines enhancement for obstruction of justice.  *See* U.S.S.G. § 3C1.1.  For the enhancement to apply, the government had to prove by a preponderance of the evidence, *United States v. Iossifov*, 45 F.4th 899, 923 (6th Cir. 2022), that Hawkins "willfully obstructed . . . or attempted to obstruct . . . the administration of justice" of the offenses for which the jury found him guilty, U.S.S.G. § 3C1.1.  Hawkins argues the government's evidence was

insufficient to prove obstructive conduct or obstructive intent. *Cf. United States v. McQuarrie*, 817 F. App'x 63, 82–84 (6th Cir. 2020) (reversing because insufficient evidence supported an obstruction enhancement). We disagree.

The district court applied the enhancement based on the trial testimony of Hawkins's law office employee, Candace Bradley. The government asked Bradley about a Kentucky Department of Financial Institutions (DFI) investigation into the practice and whether Hawkins had asked her to withhold files from the investigators. At first, Bradley testified that she could not recall Hawkins asking her to withhold anything. The government then reminded her that she had spoken to federal investigators in the case, and asked, "Do you remember being approached by Mr. Hawkins on that day or around the time frame and he asking you to withhold information from the Ruby Troyer and [Everett Jacobson] file?" Trial Tr. Day 3, R. 58, PageID 822–23. Bradley responded, "I don't – I don't necessarily. Maybe that's what he said because Ruby Troyer gave money only, she didn't have a property with it." *Id.* at 823. The government's next question was, "[D]o you remember going to Michael Todd Avery and asking him if you should do that and him telling you to turn over everything?" *Id.* Avery was one of Hawkins's associates. Bradley responded, "Right. I do remember that. I just don't remember all the particulars." *Id.* The government then asked whether Bradley remembered what led to the discussion with Avery, and Bradley replied "Not necessarily. There was so much going on and I'm the only one that knew anything about the paperwork . . . I don't remember particulars . . . I'm 70, I'm getting old." *Id.*

Hawkins first argues that the district court could not rely on Bradley's testimony about what "maybe" happened because Bradley "expressed a lack of memory due to her age." Appellant Br. at 17–20. We reject this argument, as basic evidentiary principles show that Bradley's testimony exhibited "sufficient indicia of reliability" for the district court to conclude that Hawkins

had asked Bradley to withhold the files. U.S.S.G. § 6A1.3(a) (explaining that courts may consider evidence at sentencing which "has sufficient indicia of reliability to support its probable accuracy").

To start, Bradley gave an affirmative answer to the government's question of whether Hawkins asked her to withhold the Troyer and Jacobsen files; her response was "Maybe that's what he said," and she explained why she thought so. Trial Tr. Day 3, R. 58, PageID 823. This testimony created a question for the factfinder about whether to credit Bradley's memory that Hawkins asked her to withhold the files. *See* 3 Wigmore on Evidence § 726 (3d ed. 1970) (explaining the principle that a court "does not insist on any degree of positiveness in the recollection, but accepts whatever the witness feels able to present"). It was valid for the district court to conclude from Bradley's testimony that her memory was accurate and that Hawkins had asked her to withhold the files. The portions of her testimony expressing uncertainty—starting her answer with "Maybe," and explaining her memory wasn't clear—were relevant to the credibility determination, but do not, as Hawkins supposes, mean her testimony was per se unreliable. To the contrary, "the honest witness who will not exaggerate the strength of [her] recollection is well worth listening to," because her equivocation reflects a candor which can enhance her credibility. *Id*. In light of this principle, we think Bradley's testimony met the "minimum standard of reliability" to permit the district court to consider it at sentencing. *United States v. Moncivais*, 492 F.3d 652, 658 (6th Cir. 2007).

There are multiple other aspects of Bradley's testimony that support the inference that Hawkins asked her to withhold the files. While at first Bradley could not remember Hawkins asking her to withhold information from the investigators, once the government reminded Bradley she'd discussed the Kentucky DFI investigation with federal agents, her testimony changed from

"Not that I recall" to "Maybe[.]" Trial Tr. Day 3, R. 58, PageID 822–23. This suggests that she had started to realize she had told the federal agents that Hawkins asked her to withhold documents. Further, the government's leading question was proper only if the question's factual premise—that Bradley had previously told federal investigators Hawkins asked her to withhold documents—was true. *Cf. Stewart v. United States*, 366 U.S. 1, 7, 7 n.15 (1961) (explaining the principle that counsel may not misrepresent a witness' prior testimony). Hawkins does not dispute the factual basis of the question on appeal. And he does not present any argumentation that would refute the question's premise.

Moreover, the testimony reveals that Bradley remembered specific details relating to the investigation, supporting the reliability of her testimony. Rather than speculating as to what might have occurred in theory, Bradley specifically said that Hawkins "Maybe" told her to withhold the Troyer file "because Ruby Troyer gave money only, she didn't have a property with it." Trial Tr. Day 3, R. 58, PageID 822–23. Bradley's ability to recollect this precise detail implies Hawkins had articulated a reason for her to withhold certain files. Additionally, Bradley was certain that she asked Hawkins's associate, Avery, whether to turn over everything to the Kentucky DFI, and that he said she should. As the government points out, it is reasonable to infer that Bradley needed Avery's confirmation because Hawkins's instruction to withhold some files made her unsure of the scope of the DFI investigation. These corroborating factors do not suggest the district court clearly erred.

Hawkins attempts to use the district court's previous ruling during trial to undermine its later decision at sentencing—but that is not enough to show that the court clearly erred. During the government's closing, upon objection the district court directed the government to "stay away" from asserting that Hawkins told Bradley not to turn over files to investigators. Trial Tr. Day 5,

R. 61, PageID 1094–95. The court explained: "I don't really remember and . . . I think she was inconsistent with what she might have said before, but let's move on away from that." *Id*., PageID 1095. Hawkins reads that statement as a clear indication that the district court did not find Bradley's testimony sufficient as to withholding files. But it could just as easily be read as a recognition that the court didn't remember what Bradley had said when presented with the objection in the midst of closing argument. And because whether Hawkins obstructed an investigation was not an essential element of any of the crimes for which he was charged, it makes sense that the district court asked the government to move on. Nothing about that prevented the district court from returning to Bradley's testimony for closer scrutiny at sentencing. It was not clear error for the court to then conclude that the government showed, by a preponderance of the evidence, that Hawkins tried to have Bradley obstruct the Kentucky investigation.

Hawkins argues in the alternative that even if the testimony showed that he'd asked Bradley to withhold Troyer's file, that wouldn't be enough for an obstruction enhancement because Troyer's file wasn't responsive to the Kentucky DFI investigation. This ignores the district court's finding that "Hawkins advised Bradley to withhold information concerning *two* client files during the course of the investigation." Sent'g Tr., R. 109, PageID 1847 (emphasis added). The other file was Jacobson's, and Hawkins does not dispute that it contained information directly responsive to the investigation. Indeed, the file showed that Hawkins used some of Jacobson's $165,000 to pay his other investors, even though he was supposed to use it all to pay for the properties connected to Jacobson's note. By asking Bradley to withhold this file, Hawkins asked her to conceal this evidence and thus attempted to obstruct the Kentucky investigation of his financial misdeeds. *Cf. United States v. Van Shutters*, 163 F.3d 331, 339–40 (6th Cir. 1998) (concluding

district court properly applied obstruction enhancement based on witness's testimony that defendant asked her to destroy evidence).

We end by noting that part of the reason our review of district court factual determinations is so deferential is that the trial judge sits right next to the witnesses as they testify, and thus is in the best position to evaluate what the witness's "demeanor and inflection" indicate about the veracity of their recollections. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Though Bradley's testimony was far from a smoking gun, and we might "have weighed the evidence differently," in light of the district court's relative expertise on these matters and without an affirmative showing that the district court was wrong, Hawkins has not provided us a basis to find clear error. *Id*. at 573.

## II.      Sophisticated-Means Enhancement

Hawkins also challenges the district court's application of a two-level enhancement for sophisticated means. *See* U.S.S.G. § 2B1.1. This "enhancement is appropriate where an offense involves especially complex or intricate conduct pertaining to the execution or concealment of the offense." *United States v. Johnston*, 631 F. App'x 381, 386 (6th Cir. 2015) (per curiam). We reject Hawkins's challenge, as the conduct for which he was convicted was of the type we have previously held is an appropriate basis for a sophisticated-means enhancement. Hawkins diverted the funds his clients invested to his IOLTA and personal bank accounts, then shuttled them among various corporate entities and used them to make dubious payouts, including for a Harley Davidson. It's fair to say that he perpetrated his "Ponzi-like scheme[]" by inventing "multi-step falsehoods," which is the type of conduct to which this guideline applies. *United States v. Phelps*, No. 20-5889, 2021 WL 4315947, at \*6 (6th Cir. Sept. 23, 2021) (collecting cases); *see also United States v. Simmerman*, 850 F.3d 829, 833 (6th Cir. 2017) (affirming a sophisticated-means

enhancement for a credit union employee who used accounting tricks to conceal stealing money from her employer's vault); *United States v. Lombardo*, 582 F. App'x 601, 620 (6th Cir. 2014) (affirming the enhancement for a defendant who hid his fraudulent transactions using an IOLTA account). The point of Hawkins's convoluted web was to prevent anyone from finding out he was misusing his clients' dwindling funds. The district court did not err in applying the sophisticated-means enhancement.

## CONCLUSION

For the foregoing reasons, we affirm the district court's sentence.