Fuchsberg, J.
George Arce and Efrain Nieto Camara each stand convicted of two counts of murder and one count of the felony of conspiracy in the first degree following the fatal shooting of John Morales and Manuel Carrero on the Palisades Parkway in Orangeburg, Rockland County, early in the morning of Monday, April 30, 1973. The People contended that the murders had been committed for hire, the shooting having been executed by Camara and one Rafael Martinez Perez at the instance of Arce, who had agreed to pay the gunmen $10,000 for the deadly deed. Shortly before trial, *183 Perez, originally indicted along with the other two, entered a plea of guilty to manslaughter and turned State’s evidence.
The Appellate Division affirmed the conviction in each case. On this appeal, defendants rely on a host of alleged trial errors and contend that they were deprived of their fundamental right to a fair trial. Among the contentions are that the trial court erred in its rulings and charge on corroboration, in failing to grant a mistrial because Camara was asked whether he had remained silent at the time of his arrest, in participating in the cross-examination of Perez as to the motivations for his entry of a plea, and with respect to various incidents of prosecutorial misconduct. After reviewing each of them, we find that none support a reversal.
Some exposition of the facts will be helpful to an understanding of our legal analysis. We note first that Arce, who was not present at the time and place of the actual shooting, did not testify. Camara did take the stand; he and Perez testified most fully. They agreed that, soon after 6 a.m. on the morning of the murders, Camara and Perez drove together in the latter’s car to Rockland County from the southern part of The Bronx, where each of them resided and had known one another for some years, that they did so pursuant to an arrangement they had made on the previous evening, and that there came a time when they parked at the Mt. Ivy Diner at a point adjacent to Exit 11 of the Palisades Parkway from which they could view southbound parkway traffic. Nor do they differ on the fact that, as soon as a blue Mustang occupied by Morales and Carrero drove by, Camara and Perez entered the highway and took chase after the Morales car until Perez caused the two to collide. They also both testified that right after the impact both cars pulled over to the shoulder of the road, whereupon, their occupants having exited, Morales, the driver of the Mustang, was shot to death and that Carrera, his passenger, suffered a similar fate as he was attempting to run away. They each also told the Judge and jury that no cars other than these two and no men other thamthese four played any direct part in this episode and that Perez and Camara were still together when, having abandoned their damaged car and discarded the guns used in the killings, they were apprehended by the police while attempting to leave the area by foot.
From this point on the tales of Camara and Perez diverge. Perez testified as follows: The first time he ever met Arce was *184 on Sunday, the day before the shooting, when Camara, whom he had known as a neighbor for some years, introduced him to Arce. All three went to a neighborhood Kentucky Fried Chicken store and a gas station. At Arce’s request Perez agreed to use his car to drive Camara "upstate” the next morning. Before they separated, Arce informed Perez that his destination the next morning was to be the diner off Palisades Parkway Exit 11, where Arce said he would meet Camara and Perez. The next morning, when the latter arrived there, they found Arce and a man unknown to Perez waiting for them. Camara had explained to Perez that Arce was going to pay Camara $10,000 "to eliminate somebody” and that Camara would give Perez $4,000 for driving the car. When they met Arce at the diner, he told them "the guy I want you to kill” would be a man who would soon be driving by in a blue Mustang. Shortly thereafter he pointed out a passing Mustang as the one he intended. Perez took off after it, Camara telling him to "catch up” and, when they were behind the other car, handed him a gun, saying "just in case”. At Camara’s instructions, Perez caused the collision, after which both cars stopped and their occupants alighted. Perez was still next to his own car when he observed the driver of the Mustang checking his car. At that point Camara pulled out a gun, Perez heard a shot and Camara commanded him to "shoot the other man”, which Perez did.
Camara’s version did not square with that of Perez. He pictured himself as an innocent bystander. He denied ever having met Arce until after he was arrested, insisting that he found himself in the car the morning of the shooting because Perez had offered to drive him to a Rockland County factory to try to find a job, though it turns out that he already had one. He admitted stopping at the diner, but denies seeing Arce there. According to him, when they left the diner area Perez’ car, which had been speeding, collided with the blue car, which had slowed down unexpectedly. An argument then ensued between the two drivers, in the course of which the Mustang’s driver (Morales) drew a gun and Perez "jumped him”. He went on to relate how during the struggle, "the gun went off two or three times”, after which Perez pursued Morales’ companion, Carrero, and shot him too.
In short, according to Camara, he had possessed no gun, planned no murder, shot no one and the episode, so far as he was concerned, was a completely unexpected event for which *185 he was blameless. ,His defense consisted solely of his testimony. He offered no explanation of why, if the shooting had indeed been precipitated by Morales’ resort to a gun, Perez, who had already involved Arce and obtained the District Attorney’s consent to his plea to a lesser offense, should have found it necessary not only to implicate Camara but to relate a false version contrary to his own self-interest.
Be that as it may, Camara’s main difficulty was that, aside from any inherent improbabilities in his story, there was overwhelming proof to contradict it. For one thing, Henry Goldman, a motorist in the immediate vicinity of the events, testified that he observed that Morales was not engaged in a fight but merely inspecting the rear of his car when a shot rang out and Morales’ body convulsed "as if hit by gunfire”. Another and equally disinterested motorist, Rocco Marino, provided confirmatory testimony. Two witnesses other than Perez testified that they too had seen Camara with Arce the evening before the homicides. One of them, Feliz Burgos, a friend of Arce’s for about 10 years, related that he had seen Arce, Perez and Camara together the night before, as had his fiancee, Minerva Cuadros, an employee at the fast food place where the three men went to purchase chicken. Burgos had driven to the fast food place to take her home from work that night. The car in which Camara was seen by them, a Chevelle Malibu, was later identified as a vehicle rented by Arce.
So far as the case against Arce is concerned, additional proof from a licensed wholesale firearms company and from a female acquaintance of Arce established that the gun used to kill Morales had been purchased by Arce and delivered to him through the friend’s address in Maryland. Burgos, who testified under a grant of immunity, also told the jury that, some months before the killings, Arce had confided in him that he "was going to get [Morales]”.
With these facts as background, we now turn first to the questions involving the accomplice testimony. Perez, by his own admission one of the actual perpetrators of the crime, was an accomplice and the trial court so charged as a matter of law. The trial court also held that his testimony was corroborated sufficiently for the case against Arce to go to the jury. Having excepted to that ruling, Arce now assigns it as error. Moreover, Camara now urges that the trial court also erred in refusing his request to charge that Burgos too was an *186 accomplice as a matter of law. We do not agree with either of these contentions.
The statutory standard is that a "defendant may not be convicted * * * upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with [its] commission” (CPL 60.22, subd 1). It need not prove the commission of the crime. It is enough if the evidence shown to connect the defendant with the crime satisfies the jury that the accomplice is telling the truth (People v Daniels, 37 NY2d 624, 629-630, citing People v Malizia, 4 NY2d 22, 27, and People v Dixon, 231 NY 111, 116).
As to Perez’ testimony, the corroboration here was more than sufficient to meet that test. Indeed, it can be said to have come from several different sources. The proof of the direct connection between the gun used in the commission of the crime and Arce, the evidence that Arce had rented the car in which he was seen with Perez and Camara the evening before the shooting and the testimony of Minnie Cuadros each would have sufficed even without the testimony of Burgos that he saw Arce, Camara and Perez together the night before the murders and that Arce previously had vowed to "get” Morales.
As to Burgos’ status, the question under the statutory definition of an accomplice was whether he could reasonably be considered to have participated in "(a) [t]he offense charged; or (b) [a]n offense based upon the same or some of the same facts or conduct which constitute the offense charged” (CPL 60.22). Burgos, long-time friend of Arce, admitted that he knew of Arce’s intentions with regard to Morales. Perez testified that the man with Arce at the diner when the intended victims were pointed out looked like Burgos. It also developed that Burgos had told his fianceé that he was worried about being questioned about the shootings. However, he vehemently denied that he was the man at the diner. Different inferences could reasonably be drawn from this disputed testimony and therefore whether he was an accomplice was a question of fact (People v Basch, 36 NY2d 154, 157).
In submitting that issue to the jury, the trial court advised it that if it found "that any other witness [other than Perez] was in any way concerned in or aided or abetted in any way in the commission of the crimes or any of them, he would be an accomplice. I will leave it to the jury to determine whether any other witness was an accomplice”. Camara takes the *187 position that the failure to mention Burgos by name in this instruction was error. In «light of the fact that he was the only witness other than Perez to whom the question could possibly have applied, we conclude it was not prejudicial.
We turn now to the claim that the prosecution’s attempt on cross-examination to elicit the fact that Camara had been silent at the time of his arrest was violative of his right to due process. Earlier, counsel for the codefendant Arce had put the following question to Camara: "When you were picked up by the police did you tell the police about the shootings.” An objection was overruled and Camara answered "No”. But when the Assistant District Attorney later put a similar question, the court sustained the objection with an immediate curative instruction, in which he said "[W]hen a person is picked up there is no requirement under the law that he say anything to a police officer or anyone else, and no unfavorable inferences are to be taken against him by reason of his silence because, as I indicated to you, the defendant does not have to prove or disprove anything. The law does not require that he speak at all and the fact that he does not speak cannot be held against him.”
The fact that a defendant is silent at the time of arrest may not be used to impeach him at trial (Doyle v Ohio, 426 US 610). The Assistant District Attorney’s question was therefore improper. Even unanswered, it served to bring Camara’s silence to the attention of the jury. Nor had the door to the impropriety been opened because the court had allowed the question when put on behalf of the codefendant.
However, though all trials must be fair, very few are perfect and many imperfections may be cured or alleviated by a wise and timely curative course on the part of the court. It may be less fact than fiction to suppose that an instruction to erase a prejudicial matter from a mind that has once perceived it, no matter how conscientiously carried out, can be fully accomplished. But it would also be a mistake to assume that, in the give and take of a trial of considerable length, it will not eliminate the prejudice sufficiently to assure a fair trial in many circumstances (cf. People v Ashwal, 39 NY2d 105, 111).
In the present case, we cannot say that it did not have the intended curative effect. Unlike Doyle (supra), where the objection was overruled, the cross-examination permitted and the answer was the basis for argument to the jury, the curative instruction here immediately followed upon the sus *188 taining of an objection, it was simple and direct, the tone of its languge did not serve to overemphasize the question and the matter never came up again.
As to the Trial Judge’s interruption of Camara’s counsel’s cross-examination of Perez on the expectations and commitments that may have influenced his plea, we first quote the testimony elicited:
By defendant’s counsel: "Do you recognize, Mr. Perez, that the maximum sentence that could be imposed upon you under our law under your plea is 25 years in jail? Do you recognize that? Do you know that?
"a: Yes
"the court: In fact, you were told that by me at the time you accepted your plea; isn’t that correct?
"the witness (Perez): Yes
"the court: And I also told you what the minimum was?
"the witness: Right, sir.
"the court: That you could get a minimum of eight and a third years?
"the witness: Right, sir.
"the court: And I also told you at that time that I was making no promises to you and you couldn’t expect an easy sentence. I believe my words were?
"the witness: That is correct. Your Honor.
"the court: However, I would take into consideration the fact that you cooperated. I indicated that to you, as well as anything else that might be favorable to you in any presentence report that I received?
"the witness: That is correct.”
It goes without saying that the existence of a promise of leniency or other consideration made to a self-confessed criminal can weigh heavily in the assessment of his credibility as a witness. The deprivation or serious circumscription of a co- *189 defendant’s right to cross-examine on that issue therefore can be prejudicial error (People v Roth, 30 NY2d 99). However, that is not what occurred here. The court’s interjection of its questions did not stop Camara’s counsel from returning to his cross-examination on that issue so that he might delve into the motivations for the plea. Nor did the court try to do so. Specifically, in a series of leading questions, counsel went on to probe and, in fact, secured admissions, among other things, of the witness’ consciousness of the role of the Parole Board in determining the ultimate length of his sentence and that either his lawyer or the District Attorney had explained to him that his co-operation at trial would be a factor that could be taken into account for that purpose.
Furthermore, the Trial Judge did not attempt to express or otherwise indicate a personal opinion that the witness was worthy or unworthy of belief. Nor did he indicate any penchant for overinterrogation such as might create an aura of prejudice. To the contrary, his inquiry, direct and matter of fact, was confined solely to facts of which the Judge had personal and official knowledge. His questions, put at a time when they were relevant to the ongoing inquiry on that subject, obviously were intended to clear up any possible misconceptions. (See ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge, § 5.6 [Approved Draft, 1972].)
We focus now on appellant’s charges of prosecutorial misconduct consisting, in the main, of the putting of patently objectionable questions and of the making of prejudicial comments on summation.
Defendant’s complaint is not without cause. Time after time, the Assistant District Attorney here asked objectionable questions in testimonial rather than interrogational form. The vice, of course, was that, though the court would sustain an objection, the very putting of the question served to bring inadmissible matter to the attention of the triers of the facts. Among other consequences of such tactics is that opposing counsel, who unwittingly may thus be forced into making repeated objections, are placed in a position where they appear to be trying to keep things from the jury. It also serves to communicate impressions by innuendo rather than by proof, a practice to be condemned (See 6 Wigmore, Evidence [Chad rev], § 1808). When resorted to by a public prosecutor, whose position conveys an imprimatur of authority, the injury it *190 does to both the case at hand and the administration of justice generally may be all the greater (cf. People v Alicea, 37 NY2d 601; People v Steinhardt, 9 NY2d 267, 269).
Fortunately, however, the trial court did not ignore this situation. It repeatedly sustained the objections. And, by curative instructions given in graphic and unmistakable manner, the Trial Judge tried to dissipate the effect of the unanswered questions. For instance, at one point, he told the jury:
I will tell them, as I told the jury before, the mere fact that a question is asked in and of itself is not evidence. It is the question plus the answer. Additionally, as I indicated, if I were asked whether I owned an automobile and even if I answered no, there is no inference that I owned an automobile merely because that question was asked. "the court:
I went through it many times before. "the court:
I will tell the jury too, in connection with asking a question of Mr. Lynch back there, when did you stop beating your wife, that does not mean you were beating your wife just by asking the question.” "the court:
As far as the prosecutor’s prejudicial comments on summation are concerned, they included vouching, calumny (see ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, § 5.8, and comments thereto [Approved Draft, 1971]) and other rhetorical excesses by which defendants claim to have been aggrieved. However, except for a sentence in which the defendants were referred to as "cold-blooded killers”, no objection was taken to any of these and so nothing is preserved for our review (see People v Robinson, 36 NY2d 224, 228).
Moreover, the prosecutor’s remarks did not occur in a vacuum; the "cold-blooded killers” phrase, for instance, was preceded by the use of a similar expression by one of the defense counsel (cf. People v Marks, 6 NY2d 67, 77). In further amelioration of possible prejudice to the defendants, when the prosecutor used it, the court interrupted, characterized the *191 statement as improper and directed the jury to disregard it (cf. People v Gonzalez, 38 NY2d 208, 210). It also must be remembered that the force of what might otherwise be a shocking term is lost in a case where neither of the only direct participants, Perez or Camara, denied the deliberate and violent nature of the crimes, but merely disputed whether one or the other, or both, were its executioners.
Finally, we note that, having examined each of the defendants’ other contentions which were preserved for appellate review, we find each of them without merit. On consideration of the whole record, we also find that defendants have not been deprived of their fundamental right to a fair trial (cf. People v Patterson, 39 NY2d 288, 296, affd 432 US 197).
Accordingly, the order of the Appellate Division should be affirmed in each case.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
In each case: Order affirmed.