THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HENRY GEOGHEGAN, Appellant.

First Department, May 24, 1979

APPEARANCES OF COUNSEL

*Zoltan Hankovszky* for appellant.

*Amyjane Rettew* of counsel *(Donna Krone* with her on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

MURPHY, P. J.

Defendant Henry Geoghegan was indicted for allegedly murdering and robbing Jan De Vroom in his apartment on November 13, 1975. Although the prosecution presented its case through 16 different witnesses, the facts essential to this appeal came through five primary witnesses, viz: Thomas Gilligan, Detective John Toone, Detective Carl Sgrizzi, Robert Kremer Hoke, and Police Officer James McCabe.

Thomas Gilligan, a purported accomplice of the defendant, co-operated with the police in the investigation and prosecution of this case. After testifying at this trial, he was later

permitted to plead guilty to attempted robbery in the second degree for which he was sentenced to an indeterminate three-year term of imprisonment. Gilligan's testimony as to the events surrounding De Vroom's murder will be summarized in narrative form.

De Vroom was a wealthy homosexual who, at various times, had been a friend and lover of Gilligan, Hoke and one Steven Sherman. Prior to the subject occurrence, Gilligan, Hoke and Sherman had become acquainted with the defendant and one Chris Denim. In October of 1975, Gilligan, Hoke, Sherman, the defendant, the defendant's brother (James) and possibly Denim were present at the same party. They had a general discussion about making easy money, by such means as robbing De Vroom.

On November 13, 1975, at about 3:30 P.M., the defendant, Denim, Sherman and Gilligan met and decided that they were going to steal money from De Vroom by falsely telling him that they needed cash to bail Sherman from jail. If that ploy failed, the four individuals agreed that they would then rob De Vroom. During this discussion, Denim and Sherman were playing with knives. One knife was similar to a stilletto; the other was wider with a wooden handle and brass decorations.

The four individuals arrived at De Vroom's building later that afternoon. Denim and the defendant immediately went up to his apartment; Sherman and Gilligan waited downstairs in the vestibule. After several minutes, Sherman and Gilligan proceeded to the apartment and discovered that the decedent had been stabbed to death. Defendant was standing over the body with the wooden-handled knife. Defendant threatened to kill Gilligan, as he had killed the decedent, unless Gilligan opened a file cabinet containing valuables. Gilligan opened the file cabinet and, shortly thereafter, he fled from the building.

Gilligan walked about 15 blocks to the apartment of defendant's girlfriend. By that time, the other three individuals had already arrived by cab. Gilligan noticed some personal items of the decedent in the apartment. Later that evening, Sherman, Denim and Gilligan went to the apartment of defendant's brother. Hoke, whose apartment was on a lower floor in the building, entered James Geoghegan's apartment for a short period to install a plant light. Thereafter, Sherman, Denim, Gilligan, the defendant and his brother James went to Dave Stewart's apartment. Two female prostitutes were also present in Stewart's apartment. At that time, defendant and

Denim sold decedent's watch to Stewart. Gilligan was eventually arrested on December 3, 1975. In addition to giving the foregoing testimony, Gilligan identified a knife that he had purchased a few days before trial. He stated that this knife was similar to the one used by the defendant in the murder. Over objection, the trial court received the knife into evidence.

Sherman and the defendant were arrested by Detectives Toone and Sgrizzi in the early morning hours of December 4, 1975. Sherman jumped bail during this trial. When he was finally apprehended, Sherman refused to testify for the prosecution. The trial court permitted Detectives Toone and Sgrizzi to testify to the extrajudicial statements made in the station house by Sherman after his capture. Sherman gave the detectives the same basic account of the occurrence as Gilligan gave at trial. The detectives' testimony at trial was, with one exception, in redacted form. Any references to the defendant were deleted and the word "another" was substituted therefor. The exception, alluded to above, occurred during the testimony of Detective Toone. The latter testified, without objection from defense counsel, that: "Yes, he [Sherman] said that he realized that he had seen Thomas Gilligan and he had seen the *defendant* and he said that he realized that we had it and was going to give up the whole thing" (emphasis supplied). Parenthetically, it should be noted Sherman was convicted on April 1, 1977 of murder in the second degree and robbery in the first degree. His judgment of conviction has been affirmed (70 AD2d 790, decided simultaneously herewith).

Hoke's testimony is relevant in two areas. He confirmed Gilligan's testimony that in October of 1975, there was a general discussion, in which defendant participated, to rob De Vroom. He also testified that, after the murder, Gilligan, Denim and defendant were quieter than normal when he met them in the apartment of James Geoghegan.

Police Officer McCabe stated that he was unable to locate Stewart, Denim and two prostitutes who had jumped bail during trial. The defendant presented no witnesses on his behalf.

During the course of his summation, the prosecutor stated, again, without objection from defense counsel, that: "You've heard the evidence in the case and there were other witnesses that would have been called, we would like to have called, and you know we made every effort to reach out for them. We told you the efforts we made for David Stewart, Barbara Stewart,

for this prostitute Amber Pierce [phonetic] also known as Star. You know the type of people they are. You know the people that the police were looking for. The police were looking for the witnesses and through no fault of our own they are not here to be placed on the stand. You have to consider whose friends they are." The court then charged the jury. To the extent here relevant, it should be emphasized that the trial court did not give limiting instructions with regard to the redacted testimony nor did defense counsel except to the court's omission in this area.

Upon appeal, six basic issues are presented.

█ The first question is whether the court properly permitted the two detectives to testify about Sherman's statements to them in the station house after his arrest. We all agree that the trial court should not have permitted this testimony of the detectives to be used against the defendant. Sherman's statements were properly characterized as declarations against penal interest for they qualified as such under the fourfold test enunciated in *People v Settles* (46 NY2d 154, 167). First of all, Sherman was unavailable because he refused to testify at defendant's trial. Secondly, he realized that the statements were against his penal interest when made. Thirdly, the declarant demonstrated a first-hand knowledge of the facts surrounding De Vroom's murder. Lastly, Gilligan's testimony constituted independent evidence confirming the reliability and trustworthiness of the declarations.

The more narrow question thus presented is whether Sherman's declarations against penal interest are admissible against the defendant. In *Bruton v United States* (391 US 123), the Supreme Court held that it was error to receive, at a joint trial, a confession made by one defendant implicating his codefendant where the confessing defendant did not testify. The highest court found that the admission of the confession would deprive the codefendant of his right to confrontation under the Sixth Amendment. The court further found that, despite appropriate limiting instructions, there was a substantial risk that the jury would consider the implicating reference in determining the codefendant's guilt. (Richardson, Evidence [10th ed], § 233, p 207; Fisch, NY Evidence [2d ed], § 872, p 512.) Consequently, when two or more defendants are tried jointly, a confession given by one defendant which inculpates a codefendant, may not be received in evidence unless all parts of the extrajudicial statements implicating that

codefendant can be effectively deleted. Where effective redaction is not possible, separate trials must be ordered *(People v Jackson,* 22 NY2d 446, 450).

In view of the fact defendant was tried alone, there was no valid reason for accepting Sherman's declaration into evidence. Those declarations could not be used against Sherman for he was not a party to this criminal proceeding. The declarations could not be used against the defendant because he did not have an opportunity to cross-examine Sherman, as was mandated in *Bruton.* In any event, even if Sherman had been jointly tried with the defendant, reversal would now be ordered as a matter of discretion in the interest of justice (CPL 470.15, subd 6, par [a]). As was mentioned above, Detective Toone had testified that Sherman referred to the defendant in his station house confession. This allusion to the defendant in Toone's testimony directly implicated the defendant in the murder and made the other attempts at redaction ineffective. The jury could logically surmise the word "another" referred to the defendant. Likewise, prejudicial error was committed by the trial court in failing to give proper limiting instructions to the jury with reference to the redacted testimony of the detectives. This fundamental error in the charge warrants a reversal and a new trial even in the absence of any request to charge or any exception thereto by defense counsel. (Cf. *People v Peller,* 291 NY 438, 448.)

▮ The second question presented is whether the trial court should have charged that Hoke was an accomplice as a matter of law. CPL 60.22 (subd 2) provides:

"An 'accomplice' means a witness in a criminal action who, according to evidence adduced in such action, may reasonably be considered to have participated in:

"(a) the offense charged; or

"(b) the offense based upon the same or some of the same facts or conduct which constitute the offense charged."

Where different inferences can reasonably be drawn from the evidence adduced at a trial, the question of whether a particular individual is an accomplice is one of fact *(People v Arce,* 42 NY2d 179, 186). The evidence in this proceeding tended to indicate that, one month before the occurrence, Hoke did engage in a general discussion to rob the decedent. However, the evidence also suggested that Hoke did not take part in the immediate planning or execution of the crimes committed on November 13, 1975. Furthermore, there was no proof that he

shared in the profits of the crime or assisted the four culprits after the fact. Since different conclusions could be drawn from the testimony, the trial court was correct in submitting to the jury the factual question of whether Hoke had participated in the offense charged and was thus an accomplice under the statutory definition of CPL 60.22 (subd 2).

The third question is whether there was sufficient evidence in the record to corroborate the accomplice testimony. CPL 60.22 (subd 1) provides: "A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense." To satisfy the statutory mandate, the corroborative evidence should connect the defendant with the crime in such a way that the jury may be reasonably satisfied that the accomplice is telling the truth *(People v Daniels,* 37 NY2d 624, 630).

There is no dispute that, on the evidence presented, both Gilligan and Sherman were accomplices of the defendant. Therefore, it was necessary for the prosecution to corroborate Gilligan's testimony and Sherman's declarations to the detectives, assuming for the moment that such declarations were admissible. As the trial court recognized in its charge, corroboration could be found in the testimony of Hoke if the jury found that he was not an accomplice. Absent Hoke's testimony, the record was devoid of corroborative evidence. For purposes of discussion, it will be assumed that the jury found that Hoke was not an accomplice.

The more critical question then presented is whether Hoke's testimony, in fact, connected the defendant with the crime so as to satisfy the jury that the two accomplices told the truth *(People v Arce, supra,* p 186). My colleagues find that Hoke's testimony sufficiently corroborated the testimony of the two accomplices. I disagree. Although Hoke and the defendant did engage in a general discussion to rob De Vroom, that fact does not sufficiently connect the defendant with the commission of the crime. It should be emphasized that the prosecution maintains that the general discussion was so remote in time that Hoke could not be an accomplice in the murder and robbery. For the same reason, the prosecution should not be allowed to use that same remote general discussion as the basis for linking the defendant with the occurrence. After the murder, Hoke observed that the defendant and his associates were quieter than normal. While Hoke's observations might

have been clinically correct, it in no way connected the defendant to the murder or otherwise confirmed the accounts of Gilligan and Sherman.

The fourth question is whether the knife purchased by Gilligan a few days before trial should have been received into evidence. Gilligan had testified that the defendant had stabbed the decedent with a wooden-handled knife. The prosecution, however, did not produce the murder weapon at trial. There was no need to accept the knife into evidence as a model, for the jury could easily visualize the murder weapon described by Gilligan *(People v Mirenda,* 23 NY2d 439, 453). The introduction of the knife purchased by Gilligan, despite warning instructions that it was only being received for purposes of illustration, undoubtedly lent credence to Gilligan's account of the occurrence. Contrary to the view shared by my colleagues, I believe that this error is further grounds for ordering a new trial (cf. *People v Kitchen,* 55 AD2d 575, 576).

■ The fifth question is whether the court properly permitted Police Officer McCabe to testify as to his inability to locate various missing witnesses. An unfavorable inference may arise against the prosecution where it fails to call a witness under its control in order to give material evidence in a particular criminal proceeding. *(People v Valerius,* 31 NY2d 51, 55; *People v Samuels,* 59 AD2d 574; see, generally, Fisch, NY Evidence [2d ed], § 1126, p 635.) Had the prosecution failed to call Officer McCabe, it would have exposed itself to a possible "missing witness" charge. Even if such charge were refused by the trial court, the possibility remained that the jury itself might be negatively influenced by the prosecution's failure to call those missing witnesses. Hence, the trial court correctly permitted the prosecution to show that it did not have control over Stewart, Denim and the two prostitutes. *(People v Williams,* 34 AD2d 1046.)

The sixth question is whether the prosecutor erred in his summation in making various comments with regard to the missing witnesses. In the excerpt from the summation quoted above, the evidence supported the prosecutor's statement that every effort was made to contact the missing witnesses. Nevertheless, the prosecutor did exceed the bounds of fair comment in asserting, "You have to consider whose friends they are". In the context of the summation, the jury was left with the innuendo that the missing witnesses had fled at defendant's request in order to hamper this prosecution. The evidence, as

embodied in Officer McCabe's testimony, did not justify this insinuation on the prosecutor's part. While my colleagues believe that error has not been preserved on this point for defendant's failure to object, I would, in the interest of justice (CPL 470.15, subd 6, par [a]), consider this as one of many cumulative errors warranting a new trial.

Accordingly, the judgment of the Supreme Court, New York County (SCOTT, J.), rendered March 15, 1977, convicting defendant after a jury trial of murder in the second degree (two counts), robbery in the first degree, and robbery in the second degree, should be reversed, on the law and as a matter of discretion in the interest of justice, and a new trial should be ordered.

KUPFERMAN, J. (dissenting). I accept the statement of facts and the analysis contained in the court's opinion, but I differ with the conclusions and would affirm. There is but one aspect of defendant's contentions which gives reason for pause, and that is the *Bruton* question.

Here, the alleged statement by Sherman, as testified to by Detective Toone, is admissible as a statement against penal interest.* (See Sullivan, Declaration Against Penal Interest Versus Sixth Amendment Confrontation Clause, The Advocate, vol 26, Jan.-Feb., 1979, p 4 [Bronx County Bar Assn.].)

The evidence was overwhelming as against this defendant; he was more culpable than defendant Sherman, whose conviction we affirm simultaneously herewith (70 AD2d 790).

It is urged that Toone's testimony is inadmissible in that the defendant did not and could not have the opportunity to cross-examine the defendant Sherman. The legal question posed and considered in *Bruton v United States* (391 US 123) has been clouded by subsequent decisions. (See *Dutton v Evans,* 400 US 74; *People v Maerling,* 46 NY2d 289.) It is untenable to argue "that the constitutional right to confrontation requires that no hearsay evidence can ever be introduced." *(Dutton v Evans, supra,* p 80.) "The confrontation clause does not absolutely require cross-examination, but rather safeguards of reliability" *(United States v King,* 552 F2d 833, 846).

---

* In any event, it is questionable whether this is hearsay. Toone merely testified as to what he heard Sherman say, and it was not offered for the truth of the fact asserted in the statement. (See Richardson, Evidence [10th ed], § 200, p 176; Fisch, NY Evidence [2d ed], § 763; *Dutton v Evans,* 400 US 74, 88.)

Here, the testimony of Detective Toone with respect to his investigation, leading to the legal problem involved, was trustworthy. (Cf. *United States v Medico,* 557 F2d 309, cert den 434 US 986.) It contained a sufficient "indicia of reliability" *(Dutton v Evans, supra,* p 89; *United States v Iaconetti,* 540 F2d 574, 578, cert den 429 US 1041) and was relevant to help corroborate the over-all account of what happened, as testified to by co-conspirator Gilligan. This case is unlike the situation in *Maerling (supra),* where the evidence presented was deemed tenuous, untrustworthy and remote.

SULLIVAN and MARKEWICH, JJ., concur with MURPHY, P. J.; KUPFERMAN, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on March 15, 1977, reversed, on the law and as a matter of discretion in the interest of justice, and a new trial directed.