Meyer, J.
(dissenting). Because the majority departs from the precedent established in People v Rothschild (35 NY2d 355) and does so on the wholly untenable basis that defendant’s silence when arrested was too ambiguous to "materially advance the search for truth” (p 183; see, also, p 181), I respectfully dissent.
By its decision today the majority leaves the status of Rothschild unclear, for though it appears to have ruled that impeachment by silence remains permissible in the circumstances of Rothschild (p 181) it also speaks of re-examining Rothschild in the light of later Supreme Court cases (p 179), and its holding, if it does not establish a per se rule, necessarily limits Rothschild to sui generis status as a precedent. In my view neither the due process clause nor the privilege against self incrimination requires the result reached.[1] The right to impeach a defendant by his silence at the time of arrest should turn, as does the right to impeach him by prior criminal convictions, on a balancing of the prejudice to defendant on the one hand and the probativeness of his silence as a measure of his credibility on the other.[2] Here we deal not with silence in the face of an accusation or inquiry at the time of arrest or the failure then to mention an alibi,[3] but with defendant’s failure to call the arresting officer’s attention to the fact that he was not the perpetrator but rather the victim of crime, followed by defendant’s testimony at trial, in direct contradiction of prosecution witnesses, that that was, indeed, the fact. To refuse to permit the jury to consider defendant’s silence at arrest under those circumstances is to fly in the face of human experience and of the *185 public interest in truthful testimony embodied in the impeachment rule. It is, to put it bluntly, to provide defendants with a license to lie, not required by Constitution, statute or precedent.
I
The majority’s due process analysis overextends the scope of the holding in Doyle v Ohio (426 US 610) and misapprehends the facts of the instant case. What Doyle held to be a due process violation was "the use for impeachment purposes of petitioners’ silence, at the time of arrest and after receiving Miranda warnings” (426 US, at p 619). It explained the essence of the unfairness on which its due process reasoning was bottomed in a footnote (426 US, at p 619, n 10) as follows: "After an arrested person is formally advised by an officer of the law that he has a right to remain silent, the unfairness occurs when the prosecution, in the presence of the jury, is allowed to undertake impeachment on the basis of what may be the exercise of that right.” But as Mr. Justice Stevens, dissenting, observed (426 US, at pp 625-626): "if no warning had been given * * * nothing in the Court’s opinion suggests that there would be any unfairness in using petitioners’ prior inconsistent silence for impeachment purposes.”
That there is no unfairness when no Miranda warning has been given results from the absence of misleading conduct on the part of the State; there simply is no "state action” upon which to predicate a due process claim. The novel suggestion by the majority that the constitutional provision against self incrimination is a promise by the State not to use one’s silence against him (p 179) will not withstand analysis. The provisions speak of compulsion to be a witness against oneself and as history shows are addressed to the compulsion and coercion of the Star Chamber (see Michigan v Tucker, 417 US 433, 440; People v Thomas, 46 NY2d 100, 107). That means that, as People v Rutigliano (261 NY 103) teaches, silence cannot be used as evidence in chief; it does not mean that silence cannot be used to impeach when defendant becomes a witness on behalf of himself (People v Rothschild, 35 NY2d 355, supra), any more than a defendant who pleads insanity may refuse to answer questions put to him by court-appointed psychiatrists during a mental examination (Matter of Lee v County Ct. of Erie County, 27 NY2d 432). In short, the suggested implied promise unduly expands the constitutional *186 provisions and ignores the part that waiver plays in the determination of their meaning (see, also, infra, pp 188-189).
Nor can a substitute "state action” basis be found, as the majority opinion tries to do, either in the anomaly of rewarding improper failure to warn by permitting it to justify admission of the evidence or in the accused’s possible "accurate appreciation and exercise of his basic constitutional rights” (p 180). As to the first, it assumes that any failure to warn is an improper police practice[4] and that that failure is the sole justification for admission of the evidence. But what we deal with in the instant case is a claim at trial which, if true, would have been made at or before arrest, spontaneously upon the appearance of the police, and as to which, therefore, the custody which triggers the Miranda warning obligation simply had not begun (cf. Bradley v Jago, 594 F2d 1100, 1103). There was, in any event, no improper practice in the present case because though defendant was taken into custody the police made no attempt to question him and he, therefore, never became entitled to Miranda warnings from them.
To speak of the failure to warn as justifying admission of evidence of silence misconceives the rationale of the impeachment rule and the purpose of cross-examination, moreover. The justification for admission of such evidence is the truth-seeking function of the trial and the relationship between credibility of trial testimony and defendant’s prior inconsistent conduct in remaining silent under circumstances in which he would have, were his trial testimony true, felt compelled to say so at the time of his arrest (see Doyle v Ohio, 426 US 610, supra; People v Wise, 46 NY2d 321). Human experience teaches that an important factor in evaluating a present exculpatory statement is its consistency with any prior statement on the one hand, and the failure, on the other, to make a prior consistent statement at a time when the motivation to do so was strong. The failure to warn does not "justify” admission of the evidence, therefore. It simply removes the *187 obstacle, in the nature of estoppel, that blocks use of the evidence: the unfairness of telling defendant he may remain silent and then using the fact that he did so to his detriment.
Permitting impeachment by silence involves no anomaly, therefore. But there is a very real anomaly involved in the majority’s due process argument that it is common knowledge "absorbed from our common culture” that an arrested person is not required to speak to the police,- for the predicate of Miranda is that it cannot be presumed that a defendant knows his rights upon arrest and that he must, thereforé, have spelled out for him the precise guarantees the Constitution affords him.
Absent a showing that by giving Miranda warnings or by other representation- to the person arrested the police have misled him into remaining silent, there is no basis upon which any due process violation can be found. There has been no such showing in this case.
II
No more does the privilege against self incrimination support reversal of Conyers’ conviction. What the majority has done in reaching its conclusion is to apply the exception as though it were the rule.
The rule as the Supreme Court has made clear in many different ways is that a defendant who testifies in his own defense subjects himself to the same obligation to speak the truth and the same searching cross-examination to determine whether he has as does any other witness. The exception is that the State may not cross-examine in areas in which by its own affirmative action or representation it can be said to have coerced or misled the defendant, or which are so tenuously probative as not to justify the resulting prejudice to defendant.
The underpinnings of the rule were well stated by Mr. Justice Frankfurter in Brown v United States (356 US 148, 154-156):
"If [a defendant in a criminal case] takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the jury all the facts which tend in his favor without laying *188 himself open to a cross-examination upon those facts.’ Fitzpatrick v. United States, 178 U.S. 304, 315; and see Reagan v. United States, 157 U.S. 301, 304-305. The reasoning of these cases applies to a witness in any proceeding who voluntarily takes the stand and offers testimony in his own behalf.
* * *
"[WJhen a witness voluntarily testifies, the privilege against self-incrimination is amply respected without need of accepting testimony freed from the antiseptic test of the adversary process. The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a human safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell.”
On similar reasoning the Supreme Court has upheld the use for purposes of attacking the credibility of defendant’s trial testimony of a statement inadmissible on the prosecution’s case in chief because of the lack of Miranda warnings (Harris v New York, 401 US 222, affg 25 NY2d 175, supra) or because obtained in contravention of defendant’s right to counsel (Michigan v Tucker, 417 US 433, supra; Oregon v Haas, 420 US 714). We, likewise, have held that "[o]nce a particular statement is found appropriate for impeachment purposes, any Miranda infirmity becomes irrelevant” (People v Wise, 46 NY2d 321, 329, supra).
Out of these cases has developed the concept that a defendant who takes the stand waives his privilege against self incrimination not only as it protects against prior official action, short of coercion or affirmatively misleading conduct, in improperly obtaining statements from him, but also as he has previously affirmatively taken refuge in its protection. Thus, testimony given before a Grand Jury under a grant of immunity is compelled and cannot constitutionally be used to impeach (New Jersey v Portash, 440 US 450) and because silence after Miranda warnings has probably been induced by *189 the giving of the warnings, it cannot constitutionally be used to impeach (Doyle v Ohio, 426 US 610, supra; cf. Johnson v United States, 318 US 189), but defendant’s failure at his first trial to take the stand to deny testimony as to an incriminating admission can be used on cross-examination at his second trial, where he did take the stand, to impeach his testimony denying the same admission (Raffel v United States, 271 US 494).
Raffel assumed a significant inconsistency between defendant’s testimony at the second trial and his silence at the first which later decisions of the Supreme Court in the exercise of its supervisory function relating to Federal trials have called into question (see United States v Hale, 422 US 171, 175; Stewart v United States, 366 US 1, 6; Grunewald v United States, 353 US 391, 420), but that does not diminish the force of its holding that when a defendant in a criminal case takes the stand he waives his privilege against self incrimination and like any other witness may be impeached by his prior silence,[5] provided only that there is a significant inconsistency between his trial testimony and his prior silence. Nor can it be said that when there is a sufficiently significant inconsistency between prior silence and trial testimony the fact that its use burdens the exercise by defendant of a constitutional right proscribes doing so. The Supreme Court has recognized a number of times (as the majority apparently agrees) that not every burden upon the exercise of a constitutional right is impermissible (Chaffin v Stynchcombe, 412 US 17, 29; McGautha v California, 402 US 183). Indeed, McGautha expressly held that "It does no violence to the privilege that a person’s choice to testify in his own behalf may open the door to otherwise inadmissible evidence which is damaging to his case” (402 US, at p 213) and that it is not impermissible to require that a defendant in determining whether to take the stand in his own behalf "take into account the matters which may be brought out on cross-examination” (402 US, at p 215).[6]
*190 The balance to be struck is between defendant’s decision whether to testify at trial and the strong policy against countenancing perjury. While there may be, as the majority suggests, possible prejudice to a defendant in the use of his pretrial silence in that the prosecutor, and ultimately the jury, may give it more emphasis than it deserves, defendant of course has the right to offer any explanation he sees fit, to object if the summation distorts the situation and to request appropriate instructions for the guidance of the jury,[7] whereas the State’s interest in truthful testimony as embodied in the impeachment rule is wholly defeated if the use of pretrial silence is proscribed.
The ultimate measure of admissibility, therefore, is the extent to which the pretrial silence can be said to be inconsistent with the testimony given at trial, or, to put it another way, the reliability or probative value of the pretrial silence. Grünewald v United States (353 US 391, supra), Stewart v United States (366 US 1, supra), United States v Hale (422 US 171, supra), and our own decision in People v Wise (46 NY2d 321, supra) suggest the bases for determination of this question. Grunewald held that there was no inconsistency between defendant Halperin’s claim of privilege before the Grand Jury and his trial testimony because had he answered the questions put to him before the Grand Jury in the same way he subsequently answered them at trial, he nevertheless would have provided the Government with incriminating evidence; for example, since answering the Grand Jury question whether he knew Grunewald, one of the conspirators, would have tended to incriminate him by linking him to the conspir *191 acy his claim of privilege was not inconsistent with his trial testimony that his acquaintance with Grünewald was free of any criminal element. The court noted also that Halperin repeatedly insisted before the Grand Jury that he was innocent and claimed privilege only because his attorney so advised, that Grand Jury proceedings are not adversary or protected by presence of counsel, and that Halperin was when called before the Grand Jury a potential defendant. Stewart found no inconsistency because the defendant, whose defense was insanity, testified only in gibberish, so the jury had nothing to evaluate but his demeanor. Hale found no inconsistency in defendant’s silence after arrest with respect to his exculpatory trial explanation that the money found in his possession and about which he was questioned at the police station had come from his wife, because he had just been given Miranda warnings, knew he was a potential defendant because he had been the subject of an eyewitness identification, did assert his innocence and was in a "secretive” as distinct from an adversarial setting. Those facts plus Hale’s prior contacts with the police and his participation in a narcotics rehabilitation program led the court to conclude that, on the facts of the case, there was no inconsistency since Hale "had no reason to think that any explanation he might make would hasten his release” and "had substantial indication that nothing he said would influence the police decision to retain him in custody” (422 US, supra, at p 179). Our decision in Wise concerned defendant’s denial at trial that he had, without Miranda warnings, made a prior inconsistent statement that linked him to the murder weapon, and is of value for purposes of the present discussion only for its definition of inconsistency (46 NY2d, supra, at pp 327, 328): "Simply put, where a defendant’s trial testimony offers one version of the events in question, and his prior remark to a police officer suggests a contrary view of these events, the jury is entitled to hear the previous statement so that it may fully assess the witness’ credibility.”
The majority states without analysis that defendant’s silence when arrested was "essentially ambiguous” (p 181) and "too ambiguous” to "materially advance the search for truth” (p 183). Measured by the above criteria or on any other reasonable basis for evaluation that assessment is untenable, for there was simply no reason for defendant to acquiesce in his arrest without stating the version of the facts he testified *192 to at trial if that version was the truth. When apprehended defendant, gun in hand, was being chased by one of the complaining witnesses, Dantzler. Ordered by the police, who had been alerted to the situation by a third party, to halt, defendant complied and dropped the weapon. On searching him, the officers found a black vinyl purse and some cash. Defendant was arrested and told at the time that he was being arrested for robbery, possession of a weapon, assault and attempted murder. Though he offered no such explanation when arrested, defendant testified at the trial that he had placed a numbers bet with Dantzler and when his number hit went to Dantzler’s apartment to collect. Dantzler argued with him at first, but then told him, pointing to a pouch on a table, to go get the money. When he reached for the pouch, however, Dantzler drew a gun. Defendant knocked the gun from Dantzler’s hand, picked it up and placed it and the pouch in his pocket, and then, to prevent Dantzler from following them the codefendant, Saunders, who had driven defendant to Dantzler’s apartment, tied Dantzler up with rope. As defendant and Saunders were walking toward Saunders’ car Dantzler emerged from the building screaming that he wanted his gun back. Some police officers appeared, Dantzler yelled at them that he had been robbed and defendant was arrested. Defendant denied ever having seen Grace Johnson until he was in custody.
The prosecution testimony which defendant sought to refute was that Dantzler and Grace Johnson were standing outside an apartment building talking when they were ordered by two young men, at gunpoint, to step inside, that once inside they were bound, money was removed from Dantzler’s pockets and Grace Johnson’s black bag containing money was taken, that Dantzler untied himself and as he emerged from the building saw defendant and Saunders turning the corner, was given a lift in that direction by a tow truck operator to whom he stated he had been robbed, but jumped off and proceeded on foot because the tow truck could not follow defendant and Saunders who were running against traffic, that Dantzler continued the chase on foot while the tow truck operator searched for police, that the tow truck operator was talking to police when he again spotted defendant gun in hand, that Johnson during all this time remained bound in the apartment building until released by a woman who entered the building.
*193 It is not necessary to recount all of the many discrepancies in defendant’s trial version, including the total failure to explain why Grace Johnson would have tied herself up or what motive she and the tow truck operator and the woman who untied Ms. Johnson would have had for framing defendant. Such discrepancies are for the jury to consider in making the ultimate determination, and play a negative part in determining the permissibility of impeachment by silence in that the issue disappears if there are no such discrepancies, but are essentially hindsight. The inconsistency by which is determined whether silence has probative value to impeach is, however, to be measured at the time of the silence rather than at trial.
So measured, the obligation imposed by the human instinct for self-preservation to avoid arrest by explaining that the gun belonged to Dantzler and that defendant’s running away from Dantzler, though Dantzler was unarmed, had an innocent explanation was at least as great as that imposed by his official duties upon the policeman involved in People v Rothschild (supra).[8] It is, moreover, an instinct which the law has recognized in other ways: in permitting testimony of the complaining witness in a rape trial that immediately after the crime she made complaint to a third person (People v Deitsch, 237 NY 300; Richardson, Evidence [10th ed — Prince], §§ 292, 519); in permitting testimony by a defendant who claims that his confession was coerced, that he complained of the mistreatment at the first suitable opportunity (People v Alex, 260 NY 425; Richardson, op. cit., § 519). The basis for the rule and the significance of the absence of complaint was well stated in Alex (260 NY, at pp 428-429): "When that issue [coercion of a confession] is involved, the question of whether a defendant made complaint of mistreatment at the first opportunity or within a reasonable time is material and relevant. It is of great assistance to the jury in determining whether a defendant’s claim that a confession was induced by threats and fear *194 is the truth or an afterthought, a concocted story to escape the effect of the confession. If complaint is not timely made, when it is made suspicion is aroused that it is a subterfuge.”
While those cases deal with admission of evidence concerning the making of a statement as corroborating evidence whereas we are concerned with the absence of a statement as impeaching evidence, they are important to a determination of the proper rule relating to impeachment by silence because they proceed from a common human trait: it is natural to expect that one who has been outraged in person or property will make prompt disclosure or explanation, the more so when his or her failure to do so will result in his or her own arrest. Nor is the drawing of an adverse inference from the silence of a criminal defendant unknown to the law; for example, the inference of guilt from recent and unexplained possession of the fruits of crime (Penal Law, § 165.55; People v Moro, 23 NY2d 496). Clearly, therefore, defendant’s silence at arrest can "materially advance the search for truth” and is, therefore, admissible, unless there were also present countervailing considerations of the Grunewald-Stewart-Hale genre to weaken its probative value and require its exclusion in this particular case.
No countervailing considerations were present here. To state that Dantzler had pulled a gun on him and he had taken it away from Dantzler would not have incriminated defendant. He made no statement of innocence or guilt and at the moment of his arrest had not so far as he knew been identified by anyone as the perpetrator of a crime, nor had he received Miranda warnings. The most that can be said in favor of excluding the evidence of his silence, therefore, is that since he was carrying a gun he knew he was a potential defendant, that the "proceedings” were not adversarial (though they can hardly be deemed "secretive”) and that (as the majority assumes) he was in fact aware of the Fifth Amendment. The first furnishes no basis for exclusion because the explanation of possession of the gun offered at trial would have obtained his release and Dantzler’s incarceration. The second has little or no bearing on the natural instinct to explain in the situation in which defendant found himself at the time of arrest. As to the third, it is sufficient in the truth-seeking process of a trial to provide defendant with the opportunity to put before the jury the motivation for his *195 silence.[9] To give it the exclusionary effect that the majority does, however, is to emasculate the rule.
In final analysis, the only advantage of the majority’s rule, if it is a per se rule, is ease of application, but its adoption on that basis alone would be procrustean. If on the other hand, the rule it adopts is intended to allow impeachment of a defendant by silence in "unusual circumstances”, as appears to be the case, the failure to categorize the instant case as one such or to furnish guidelines concerning what may be so categorized can only result in confusion for the trial Bench and Bar.[10]
III
It is necessary to note additionally only that nothing in statute, or with two clearly distinguishable exceptions, in case law of our court requires the result the majority reaches. The only statute which touches the subject is CPL 60.15 (subd 2) which is, however, concerned only with the impermissibility of drawing any inference from defendant’s failure to testify in his own behalf at trial.
Of the cases relied upon by the majority or in defendant’s brief many are inapposite because they concern use of silence as part of the prosecution’s direct case, a wholly different proposition from that here under discussion, or are general statements, broader than necessary for the case in which said and made without reference to a situation such as that of the instant case, so far as appears from the decision. In the first category fall People v Rutigliano (261 NY 103, supra); People v Travato (309 NY 382); People v Bianculli (9 NY2d 468); People v Christman (23 NY2d 429), which are also distinguishable on the grounds that they involve failure to respond to accusations or to assert an alibi (see n 3 above) and that their reasoning relates to a failure to respond to statements made to them, rather than failure to speak spontaneously as the supposed situation would require (e.g., People v Rutigliano, *196 261 NY, supra, at p 107, "his silence should not be counted as giving assent to what he hears”). In the second, fall People v Arce (42 NY2d 179, 187) and People v Thomas (46 NY2d 100, 109, supra).
Of the four cases in which we have considered the use on cross-examination of prior silence as a means of impeachment two (People v Rothschild, 35 NY2d 355, supra; and People v Fiore, 34 NY2d 81) have permitted such use, and two (People v Petersen, 4 NY2d 992; and People v Hyman, 308 NY 794, affg without opn 284 App Div 347) have not. Hyman appears from the Appellate Division decision to have concerned cross-examination of defendant-doctors, who at trial testified that the alleged abortion was therapeutic, concerning whether they had refused while in custody to admit knowing the person upon whom the abortion had been performed, and we are told by the dissent in the Appellate Division (5 AD2d 698) that Petersen concerned cross-examination of a defendant charged with driving while intoxicated, who testified at trial that someone other than he had been driving the car, whether he had made any such assertion on the occasion of his arrest and while in custody. Petersen is closer to the spontaneous impulse that would have operated in the instant case had Conyers’ trial testimony been true than is Hyman, but both are distinguishable because as indicated by the authorities upon which they relied (cases such as Rutigliano, excluding use as direct evidence of prior silence) they gave no apparent consideration to the distinction between use on direct and use for impeachment purposes on cross.
Fiore and Rothschild on the other hand, allowed impeachment of defendant. Fiore may be distinguished from the instant case because it was defendant, seeking on redirect examination to bolster the exculpatory version testified to by him, who testified that he had not been asked before indictment to make any statement, whereas he had been called before the Grand Jury but was not permitted to testify because he refused to waive immunity. We held that it was permissible to impeach defendant by showing the latter fact even though it could not have been revealed as evidence in chief. The value of Fiore to the present discussion is limited to its distinction between evidence in chief and impeachment and its conclusion that not every burden upon the right to remain silent is impermissible.
*197 Rothschild is more closely in point for it permitted cross-examination of a police officer defendant, who had testified on direct that he had received money only to set the giver up for a bribery charge, to show that he had not revealed the scheme to his superiors, or to his fellow officers at the time of arrest. In so holding we relied (35 NY2d, supra, at p 360) upon the patent inconsistency between silence and the defense asserted and defendant’s patent obligation to speak and noted with interest similar holdings in United States ex rel. Burt v State of New Jersey (475 F2d 234) and Agnellino v State of New Jersey (493 F2d 714).
It would unduly extend this already too long opinion to discuss in detail Burt and Agnellino, and in any event, our noting of those cases "with interest” is not the same as noting them with approval. Nonetheless, it is worthwhile pointing out that though neither involved the "patent obligation to speak” to which we referred in Rothschild, each found the inconsistency involved to be as "highly probative” as did we the inconsistency in Rothschild (35 NY2d, supra, at p 360). In sum, the obligation to speak imposed by duty in Rothschild was no more compelling than that imposed by Conyers’ own self-interest were his trial testimony true and, therefore, furnishes no basis for distinguishing Rothschild from the instant case. Just as in Rothschild defendant’s testimony was "diametrically inconsistent with that produced by the prosecution”, and his silence upon arrest was "patently inconsistent with the defense asserted” (35 NY2d, supra, at p 360), so in the present case is Conyers. Having distinguished between direct and impeachment use of silence in that case to reach a sound and proper result, we now effectively reverse that result.
For the foregoing reasons, I would reverse the order of the Appellate Division insofar as it is appealed from, and would remit to the Appellate Division for further proceedings.
Chief Judge Cooke and Judges Wachtler and Fuchsberg concur with Judge Gabrielli; Judge Meyer dissents and votes to reverse in a separate opinion in which Judges Jasen and Jones concur.
Order affirmed.

. While the majority cites both Federal and State due process and self incrimination provisions, I do not understand its decision on either point to be based on the State Constitution, independent of the Federal, nor does there appear to be reason, the language of the two Constitutions being virtually identical in both respects, for interpreting them differently under the circumstances of this case.

. The rule suggested is limited to time of arrest because the silence sought to be used in this case was at that time. No opinion is expressed concerning similar use of postarrest silence, but cf. Judge Stevens dissenting in Doyle v Ohio (426 US 610, 632-633).

. Accusation or inquiry may be differentiated from the situation of the instant case because it so much more readily lends itself to police abuse (see McCormick, Evidence [2d Cleary ed], §§ 161, 270). Alibi requires recall which may require more time and thought than is available at the time and under the circumstances of arrest.

. It is highly improbable that an officer will deliberately omit warnings in the hope that the person he arrests will remain silent so that his silence can later be used to impeach his trial testimony. Improper police practices when engaged in are intended to produce not silence but statements. But even were that not so, as the Supreme Court stated in Ham's v New York (401 US 222), affirming our decision in 25 NY2d 175, "the benefits of this process [impeachment] should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby * * * sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief’ (401 US, at p 225).

. Compare Grünewald v United States (353 US 391, 420). Note that despite a dissent by Mr. Justice Black, joined by the Chief Justice and Justices Douglas and Brennan, urging that Raffel should be overruled, the court in Grünewald failed to do so, holding simply that Raffel was not controlling because there was no true inconsistency.

. That part of what may be brought out on cross-examination is silence at the time of arrest does not compel the difference in result suggested by the majority in distinguishing Harris v New York from the instant situation (pp 182-183). True Harris concerns deterrence from constitutional violation whereas we are concerned with *190 defendant’s silence in a situation in which silence is unnatural, which could be in the intentional exercise of a constitutional right, but the only compulsion involved in the latter is far from an impermissible one. All that is required is that defendant include in the considerations by which his decision to remain silent at arrest is arrived at the possibility that doing so may be used for impeachment when there is sufficiently great discrepancy between trial testimony and arrest silence to make the latter probative. In short, such burden as there is does not have the proportion attributed to it by the majority.

. See, e.g., Regina v Cripps (3 Cr Rep NS 367, 371), in which the British Columbia Court of Appeals quoted approvingly the following passage from an earlier case: "it is wrong to say to a jury 'Because the accused exercised what is undoubtedly his right, the privilege of remaining silent, you may draw an inference of guilt’; it is quite a different matter to say 'This accused, as he was entitled to do, has not advanced at any earlier stage the explanation that has been offered to you today; you, the jury, may take that into account when you are assessing the weight that you think it right to attribute to the explanation’.”

. The short answer to the majority’s suggestion that silence in the instant case is essentially ambiguous is that we deal here not with one claiming simply innocence but with a person who claims to have been the victim of crime. The probability that such a person will withhold stating so to await a calmer moment, because he believed an explanation useless, or because he feels animosity toward the police is not so great that use of his silence to impeach him should be proscribed, though, of course, he may put such explanations before the jury for their use in evaluating his credibility. By taking the stand the defendant has waived his privilege against self incrimination to the extent necessary to evaluate his testimony.

. As Mr. Justice Stevens, dissenting in Doyle, suggests (426 US, at p 626) exclusion is not warranted because the risk that a truthful defendant will be deceived by his understanding of the Fifth Amendment and also will be unable to explain his honest misunderstanding is so much less than the risk that exclusion of the evidence will merely provide a shield for perjury.

. For example, the majority’s direct burden rationale, discussed in footnote 6 above, would outlaw Rothschild’s use of silence to impeach even though defendant jn that case had a duty-imposed obligation to speak.